UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRANDON SMILEY,

          Plaintiff,

     v.                                             Case No. 22-C-1158

NATHAN R. PACH, et al.,

          Defendants.

## DECISION AND ORDER

Plaintiff Brandon Smiley, a Wisconsin prison inmate who is representing himself, is proceeding on an Eighth Amendment claim that Correctional Officers Nathan Pach, Christopher Schwab, Ryan Hintz, Rodney Reynolds, Joshua Langridge, Geoffrey Schultz, and Jason Schmidt (Defendants) used excessive force during a cell-extraction at the Waupun Correctional Institution on June 21, 2022. Dkt. Nos. 11-12. The parties filed cross-motions for summary judgment. Dkt. Nos. 22 & 29. Upon review of the parties' respective motions, the Court concludes that there exist material factual disputes that preclude the entry of summary judgment. Both motions are therefore denied.

### BACKGROUND

On June 20, 2022, Plaintiff, then an inmate at Waupun Correctional Institution, complained about thoughts of self-harm, so staff ordered his placement on "observation status." Dkt. No. 31 at ¶9. Plaintiff admits he said he was "suicidal" but claims he only said that because he was not getting anyone to address the panic attack he was actually experiencing. Dkt. No. 42. He claims

he told the Psychiatric Services Unit staff that he was fine, but apparently the decision had already been made to place him in Observation. *Id.*

To be placed on observation status, Plaintiff had to leave his assigned cell, go to a holding cell to be strip-searched for contraband, then move to a special observation cell. Dkt. No. 31 at ¶10. The strip-search is a critical precursor to placement on observation status to ensure that the inmate does not bring unauthorized items into the unit that can be used to self-harm or hurt others. *Id.*, ¶16.

At around 11:00 a.m., CO Hintz went to Plaintiff's assigned cell to move him to a holding cell. *Id.*, ¶11. Plaintiff initially refused to cooperate and said,

> I'm not doing anything you ask me to do. I told them I was homicidal/suicidal. I'm not coming out. I'm going to make you guys work. You guys are going to have to work to get me out of there. I feel like fighting.

*Id.*, ¶12; *see also* Dkt. No. 38-1 at 2. At that time, Plaintiff had also clogged the toilet in his assigned cell with clothing, so the cell floor was flooded with water. Dkt. No. 31, ¶13. After about 30 minutes of persuasion, Plaintiff finally agreed to leave his assigned cell to go to the holding cell. *Id.*, ¶15.

When Plaintiff arrived at the holding cell, he refused to be strip-searched. *Id.*, ¶17. Plaintiff reiterated that he wanted to make staff "work;" that they would have to "suit up," "spray," and "tase" him to get him to leave the holding cell; and that he wanted to fight. *Id.*, ¶18. CO Hintz told Plaintiff that he wanted to avoid a physical altercation and that Plaintiff should just comply with the strip-search so they could proceed with plans to place him on observation status. *Id.*, ¶20. Plaintiff refused. *Id.*, ¶17.

CO Hintz decided to defuse the situation by letting Plaintiff stay in the holding cell overnight to avoid a physical altercation. *Id.*, ¶21. He was not able to strip-search Plaintiff at that

time. *Id.*, ¶17. CO Hintz explains that, based on Plaintiff's words that morning and on his experience as a correctional officer, he believed that Plaintiff was looking to start a fight with staff that morning. *Id.*, ¶19.

The following day, on June 21, 2022, at about 10:00 a.m., CO Hintz went to Plaintiff's holding cell to again try to convince him to comply with a strip-search and leave the holding cell. *Id.*, ¶23. Other institution staff, including psychological services clinicians, had also tried to convince Plaintiff to comply with a strip-search and leave the cell, but he continuously refused. *Id.*, ¶22. Plaintiff again stated that staff would have to suit up, spray him, and tase him, and that he wanted to fight. *Id.*, ¶24.

About 24-hours had passed at that point, so CO Hintz decided to call a superior to request a cell-extraction team. *Id.*, ¶27. CO Hintz explains that Plaintiff could not stay in a holding cell indefinitely for several practical and security-related reasons. *Id.*, ¶26. First, the holding cell did not have a bathroom or drinking water, so it was not equipped to be a permanent cell. *Id.* Second, the holding cell was intended to function as a transitory space, so it was needed for other inmates. *Id.* And third, Plaintiff was making threats of self-harm and had not yet been strip-searched, so it was not safe for him to be fully clothed in a holding cell, where he could make a noose with his own clothing and harm himself. *Id.* CO Hintz's request for a cell-extraction team was later approved. *Id.*, ¶27.

At around 11:47 a.m., CO Hintz assembled a "pad-subduing team" to extract Plaintiff from the holding cell. *Id.*, ¶¶28-29. CO Hintz explains that other methods of extraction, such as use of OC Spray or a taser, were unsafe because a holding cell is a very small space, only about three feet wide by four feet long, so there was a risk that Plaintiff might fall and hit his head on one of the walls. *Id.*, ¶¶31, 36. Plaintiff had also refused to be strip-searched prior to his placement in the

holding cell, so CO Hintz did not know if Plaintiff had a homemade weapon in the cell with him. *Id*., ¶40. A pad-subduing team was necessary to ensure the safety of not only Plaintiff, but also the correctional officers entering the cell. *Id*., ¶¶36, 38-41.

The "pad-subduing team" consisted of five correctional officers, in addition to CO Hintz. It included: CO Schmidt as "team lead," CO Reynolds as "Pad #1," CO Pach as "Pad #2," CO Langridge on restraints, and CO Schultz as the handheld camera operator. *Id*., ¶29. CO Hintz supervised but did not participate in the extraction. *Id*., ¶32. Defendants contend that, to begin the extraction process, CO Reynolds, CO Pach, CO Schmidt, and CO Langridge lined up tightly front to back outside the holding cell door. *Id*., ¶30. Due to the small size of the cell, only CO Reynolds and CO Pach planned to enter the cell. *Id*., ¶31. CO Hintz asked Plaintiff three more times whether he would voluntarily comply with a strip-search and leave the holding cell, so that they could proceed with plans to place him on observation status. *Id*., ¶¶33-35. Plaintiff did not respond. *Id*.

The parties dispute what happened next. According to CO Reynolds and CO Pach, as they entered the holding cell, Plaintiff took a boxer's stance with his feet separated and hand in front of his body. *Id*., ¶¶37, 43. CO Reynolds and CO Pach used the Pads to push Plaintiff against the back wall then lower him to the floor has quickly as possible to limit the likelihood of injury to all parties involved. *Id*., ¶¶38-45. Plaintiff resisted the entire time, first, by headbutting CO Reynolds, then, by attempting to bite him. *Id*., ¶44. CO Hintz, CO Langridge, CO Schmidt, CO Schwab, and CO Schultz remained outside the holding cell and could not see into the cell once CO Reynolds and CO Pach entered with their pads. *Id*., ¶¶46-47.

According to Plaintiff, he did not take a boxer's stance and claims that he "told staff no" but then "stepped back to turn and face the wall" to be handcuffed once they opened the door. Dkt.

4

Nos. 42 & 21 at ¶¶6-7; *see also* Dkt. No. 23. Plaintiff claims that, when he turned to face the wall, he was met "with the most extreme force." Dkt. No. 42 at 2. He states he was struck with the pads with such force that his head hit the wall splitting his right eyebrow. He was so dazed that he urinated on himself. He was then slammed to the ground, punched a few more times in the back of his head, and then cuffed and stripped. *Id.* According to CO Hintz, Plaintiff was then taken to the Health Services Unit where the wound to his eyebrow was cleaned and sutured. Dkt. No. 38-1. Although CO Hintz states in his incident report that "video documentation and photos accompany this report," *id.*, no video recording of the incident has been submitted to the court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

To survive summary judgment on an Eighth Amendment excessive force claim, Plaintiff must present evidence from which a reasonable jury could conclude that Defendants applied force maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The question of whether force was applied in a good faith effort to maintain or restore discipline can turn on the need for force, the amount used, the prisoner's injury, the threat reasonably perceived by the correctional officers, and any efforts to avert a forceful response. *McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019). Prison officials are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *see Hudson*, 503 U.S. at 6, and are authorized to "handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable," *see Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

Defendants contend that they are entitled to summary judgment because they used an appropriate amount of force in a good faith effort to maintain institution security. Dkt. No. 30. That would be true if Defendants' version of the facts was undisputed. But certain facts are in dispute.

To be sure, the decision to use a pad-subduing team to extract Plaintiff from the holding cell was appropriate under the circumstances. The undisputed evidence shows that Plaintiff refused to leave the holding cell for over 24-hours, and it was unsafe for him to be there permanently. Specifically, the holding cell was not equipped with a bathroom or drinking water; and Plaintiff had threatened self-harm, along with refusing to be strip-searched, so he could have

6

Case 1:22-cv-01158-WCG   Filed 03/19/24   Page 6 of 8   Document 50

used his clothing or created a homemade weapon to harm himself. Further, numerous individuals tried to avert the use of force by asking Plaintiff to voluntarily comply with a strip-search and leave the cell, but he refused. Plaintiff was even given three opportunities to voluntarily comply *after* the pad-subduing team arrived, but he still refused. And Plaintiff readily admits throughout his briefing materials that he refused to leave the cell, refused to comply with the officers' orders for over 24-hours, and argued with staff. *See* Dkt. Nos. 23, 42, & 44-1. Under these circumstances, Defendants had no option but to use force to extract Plaintiff from the holding cell.

Second, the use of pads to extract Plaintiff from the holding cell was also reasonable. Due to the small size of the holding cell, OC Spray or a taser increased the risk that Plaintiff might fall and hit his head on one of the walls. Further, because Plaintiff had refused to be strip-searched prior to placement in the holding cell, it was unclear whether he had a homemade weapon inside the cell that could be used to attack staff. Toward that end, Plaintiff had been in the cell for over 24-hours, so he had ample opportunity to plan an attack, had he wanted to. Given Plaintiff's combative words and his refusal to cooperate with staff in the 24-hours prior, Defendants were justifiably concerned about their safety. Stated a bit differently, a pad-subduing team was the safest way to extract Plaintiff from the cell, both for Plaintiff himself and for the correctional officers involved.

It is the dispute over what happened when Defendants entered the cell that precludes entry of summary judgment in their favor. Plaintiff denies Defendants' claim that he was in a boxer's stance and that he headbutted CO Reynolds and attempted to bite him. To the contrary, Plaintiff claims that, once they opened the door to the cell, he turned to face the wall with his back to the officers expecting to be placed against the wall and cuffed. Dkt. No. 42. Instead, he was struck with such force that his head hit the wall, his eyebrow was split and, in a dazed state, he urinated

7

on himself and fell to the ground where Defendants "punched a few more times in the back of my head." *Id.* at 2.

Absent any video evidence, the Court is unable to determine on the record before it which version is true. If Plaintiff's version is true, a jury could conclude that one or more of Defendants violated his constitutional rights by subjecting him to the kind of wanton and unnecessary cruelty that the Eighth Amendment proscribes. It follows that Defendants' motion for summary judgment must be denied. And since Plaintiff is not entitled to judgment if Defendants' version is true, his motion must likewise be denied.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 29) is **DENIED**. Plaintiff's motion for summary judgment (Dkt. No. 22) is likewise **DENIED**. The Clerk is directed to set this matter on the Court's calendar for a telephone conference to address further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 19th day of March, 2024.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge